at all. Mr. Sansone. Good morning, Your Honors, and may it please the Court. Nick Sansone, on behalf of the subscribers, and I have Mr. Ed Kilpella with me at council table. With the Court's permission, I'll reserve three minutes for rebuttal. Great. Thank you, Your Honor. On December 10th, 2019, Indemnity's Board of Directors met to set Indemnity's management fee rate for 2020, purportedly based on current and forecast market conditions. And on December 8th, 2020, the Board met again to set the rate for 2021, again, supposedly based on the current state of the market. The subscribers filed a Pennsylvania State Court action claiming that Indemnity breached its fiduciary duty by setting excessive fee rates for 2020 and 2021. But the federal district court, in this case, took the extraordinary step of enjoining the state court action before it could even begin. The court did so because it believed that this drastic step was necessary to protect the judgments in two prior federal actions. This was error. Neither prior judgment did or even could have assessed the legality of the 2020 and 2021 rates, which were set only after both judgments became final. And neither judgment resolved any issue relevant to the legality of the 2020 and 2021 rates. That's kind of strange to me because at least in the BILTS II case, there's talk about this being a continuing violation going back to the 90s and so that everything is just one big breach of fiduciary duty. And so, there's two ends of the spectrum. One, it's just a big blurry breach of the fiduciary duty. And the next, it's an annualized discrete determination. And so, a few years ago, the answer was, it's just one big blurry fiduciary duty and we want to get all the fees back to the 1990s. And now, the answer is totally discrete. Each year is completely separate, completely different. And so, that's a little jarring to kind of flip the script on that one level. Obviously, in the interest of your clients, when you thought you could get 20 years worth of fees repaid, you wanted it to be big and blurry. When you realize, oh, we could be in trouble and this might be precluded, you want it to be narrow and discrete. So, you know, it seems like a change of position. So, two responses to that, Your Honor. The first response is that in the BILTS case, the fees at issue were not the excessive management fee. Those were fees that were service charges and additional fees that were just set at discrete moments in time. At least that's how the claim was pled. Here, it's not just the subscribers who argue that the management fee rate is set once a year on a distinct basis based on current market conditions. That's what indemnity itself represents to the SEC. And that site is at JA-201. That's what indemnity tells the public in its press releases. And those are cited at JA-84 and 86. And that's what indemnity said to the district court in this case, in its complaint at paragraph 32. So, indemnity itself says that every year the management fee rate is set on an independent basis. And that is exactly what the subscribers have alleged here. And that's what the claims in the state court action are. The second response- Sounds like you're arguing that you could just sue them every single year if they set the fee at 25% or lower. Because each decision by indemnity to set an excessive rate of fee, when it goes in December to look at all the current market conditions and decide what's appropriate, every time it does that at an excessive rate, it is an independent breach of fiduciary duty. At least that is- To answer to my questions, yes. Claim preclusion would not pose an obstacle. You can sue them every year. Yes. I guess I'm struggling with excessive fee when the contract specifically allows a fee up to 25%. How could it possibly be excessive? And that's a merits question. The question is, what fiduciary duty does indemnity owe to the exchange under Pennsylvania law? We think that's a question that the Pennsylvania court system is uniquely equipped to address. And whether or not extracting an excessive rate above and beyond what indemnity needs in order to fulfill its obligations to the exchange, whether that is a breach- How does a subscriber agreement suggest that the fee that indemnity takes is as much as it needs? The subscribers haven't raised a breach of contract claim. The claim is a breach of fiduciary duty arising out of independent responsibilities that derive from Pennsylvania law. I guess I'm struggling out of the gate with the notion that one could breach a fiduciary duty by scrupulously adhering to contractual terms. And we think this question of state law is precisely why this claim is best addressed in the state court system. Could you address the merits of what I just asked? The merits- How is it legally possible for a decision maker to breach a fiduciary duty by scrupulously adhering to the terms of the contract? The- Do you have any case that supports that anywhere? I'm not prepared to address the merits of the underlying claim. Do you have any case anywhere at any time that said that a corporate actor breached a fiduciary duty by scrupulously adhering to the terms of the written subscriber agreement or other contract? I apologize. I don't have that right in front of me. I can supply that on rebuttal. But I do want to turn to sort of my second response to you, Judge Phipps, which is that in terms of assessing whether the fiduciary breach was sort of one continuing practice that began in 2007 or whether it is an independent violation that occurs each and every year, indemnity itself has sort of accepted, and this is on JA 234, quote, all that matters for the claim preclusion analysis is what's pleaded on the face of the complaint. And so the question of whether under Pennsylvania law the breach occurs when the management fee is set each and every year or whether under Pennsylvania law that breach is sort of has to be pleaded as a continuing practice, that's a question, again, that the Pennsylvania courts are precisely equipped to handle. So just to tease that out, if the face of your pleading said we're here on what I'm calling the big blurry theory of fiduciary duty, we don't want to talk discreet. We don't want to talk 2019, 2020. We just want big blurry. That's claim precluded under your theory, if that's what you pled. That would be, that's out, right? That's exactly right. That's exactly right. So that's gone. But what you're saying is, yeah, fine, but we're here based on a new theory, almost like you can start a new case and if you didn't plead alternatives the first go around and there's been new events that do it, I guess you get to re-up. And so you re-up, you paid your new filing fee, you're back in and you say, okay, hit us with the big blurry theory. We aren't alleging that anymore. We just want one year at a time. That's correct, except I want to be clear that this is not necessarily a new theory of recovery. It's not a new claim, but it's a new, I don't know. It's a new cause of action because we fully accept that we couldn't go back now and challenge the 2017 fees, the 2016 fees. Or even the 2019 and the 2020 fees under a continuing violation theory. That's correct, that's correct. But the reason I talk about the earlier fees is because I don't think we could challenge those fees under either theory because this sort of new, we would say this is a new cause of action, but it is a new cause of action that asserts a new theory as to why this post-judgment conduct is illegal, or sorry, why it is, you know, yes, it's challenging that post-judgment conduct. And therefore, legal theories that could have been brought earlier in the Belts and Ritz claims, those are precluded. So again, we couldn't go back and say the 2017 fees, the subscribers chose to challenge them under a sort of blurry, all of it's a breach theory. Now we're going to go back and challenge those same fees on a different theory. But what we have here are new fees. And we are challenging those. We could not have challenged those in either Belts or Ritz. And this Court has drawn a bright line. But to avoid claim preclusion, you have to allege new material facts, correct? If the defense establishes that the elements of claim or issue preclusion are satisfied, a change in material facts can sort of show why that wouldn't apply. But we would argue that the charge of the new fees is itself a new material fact. Well, that's what I was asking. So you agree that you need to show new material facts to avoid claim preclusion. And your argument is that the fact that it's a new year is a new material fact. The fact that a new independent decision by indemnity was made to set the management fee at 25% for 2020 and then again for 2021. Those are new facts. So as long as they continue to set it year after year after year at 25%, you're going to have a case every single year. This seems like the poster child for the relitigation exception to the Anti-Injunction Act. Why isn't it? It isn't because those, as the Supreme Court has held in multiple cases and as this Court has held in multiple cases, new conduct that arises after a judgment that gives rise to a new cause of action that couldn't have been asserted in an earlier case is not precluded. Now, certainly your Honor's concern about serial relitigation issue preclusion could well address that concern. If this claim were to go forward on the merits and there were a judgment, for example, that indemnity bears no fiduciary duty to the exchange or a judgment that, you know, charging the 25% management fee was perfectly in line with whatever duties it owed to the subscribers, then absent some sort of material change that would alter those conclusions, then I think future cases challenging that 25% management fee would not be barred by claim preclusion but rather by issue preclusion. And that's precisely why we want this case to go forward in the Pennsylvania courts that are equipped to handle Pennsylvania law so that they can determine these issues and have the parties' rights settled once and for all. So but why wouldn't this new independent theory each year it's an independent fiduciary decision also be an exception to issue preclusion? Because you would sit there and say, oh, it's not the same issue. It was based on current market conditions. And the market conditions aren't the same this year as they were last year. So issue preclusion is pretty attractive. Like if you said to me, gee, is this an issue preclusion case or a claim preclusion case, I can see why you're steering us to issue preclusion. But is it really going to be susceptible to issue preclusion? Isn't that just a mirage? Because when they come and they say, here we are in issue preclusion, it's not the same issue. They said it's an independent decision made in an independent year based on the state of the market. The market wasn't the same last year as this year. I think it would depend on what the court said in its opinion denying the claim. So if, for example, the court said, under Pennsylvania law, you owe no fiduciary duty whatsoever. Fine. Or if the court said, in line with Judge Hardiman's line of questioning, there's no problem here. The contract says you can take up to 25%. They took up to 25%. There's no breach on that basis. However, if what the court held in denying the claim was, well, we've looked at the market conditions in 2020 and 2021. We think 25% was perfectly appropriate. Then I think in that circumstance, maybe in 2022, 2025, whatever, we go through a big economic downturn. Hopefully we don't. But in that circumstance, maybe then issue preclusion wouldn't be an obstacle because, again, there could be a change in material operative facts that could be shown in that instance. All right. We'll hear you on rebuttal, Mr. Sansone. Thank you. Mr. McGinley. Good morning, Your Honors. May it please the Court. Michael McGinley of Deckert LLP on behalf of Apelli Erie Indemnity Company. The district court did not abuse its discretion, and its injunction should be affirmed. The injunction protects the federal court's judgments in writs and belts, and it does so by barring the three Stevenson plaintiffs from heading to state court to relitigate the same cause of action that was adjudicated in indemnity's favor in those two federal judgments. This case falls within the heartland of the AIA's relitigation exception. In fact, it's precluded twice over here. It's claim precluded by both writs and belts, and it's issue precluded by writs. As the district court held, all three cases rest their claims on the same common nucleus of operative facts, which are the alleged conflict of interest, inherent in Erie's structure as a reciprocal insurance exchange, the Hurt Family's controlling stake, and the supposed scheme to favor indemnity over exchange by, quote, maintaining the management fee at the contractually authorized 25 percent since 2007. I hear you that the same parties are involved, a similar contract is involved, but if we accept that this claim, the current claim that's being litigated in the state court, is only about the harms that the subscribers suffered in 2020 and 2021, how could that possibly have been litigated in writs and belts? So it's the same situation that you saw in Huck and in Sims and in Foster, which is the conduct that the plaintiffs are challenging is exactly the same. They're not saying, and I don't hear Mr. Sansone saying here today, at any point when pressed by your honors, that there's something unique about those sets of years that make up the thrust of their claim. In Huck, there was one injury. It was in 1990, and there were multiple suits about what happened in 1990. But what the subscribers are urging here is that the injury occurred in 2020. When that decision was made in December of 2019 to charge 25 percent in 2020, it incurred an injury. So that's not about, you know, in here, they're saying they're injured each year when each of these two years. So that's a little different from Huck. So with respect, I don't think it is, Your Honor, because in Huck, the argument was, in fact, that there was a new injury. Remember, in Huck, the plaintiff said, I'm now bankrupt because you've continued to deny me access to the C-Ramp. Right. And so I think a new harm from the same event, from the defendant's conduct in 1990. But I don't think it's the same event either. I mean, I think what the plaintiff in Huck was saying is the reason that we aren't claim precluded is because they keep denying us access to the C-Ramp. And it's the same as plaintiffs here saying the reason we're not claim precluded is because they keep collecting the 25 percent year after year. And I think it goes to Judge Hardiman's point that if you were to accept their argument that the mere fig leaf of the passage of time or slapping two new years on when you challenge exactly the same core set of conduct, you allow them to basically just repeat. Let's define the core set of conduct is setting the rate, the core conduct. Not under their theory here. No, Your Honor. Well, under your view. Well, but it's not about our view. This is claim preclusion about the theory that they've pled in all three cases. And the theory they've pled in all three. Your argument that their claim precluded any time they bring a new case that challenges the rate that was set by your client. If their theory rests on the same core operative facts, i.e., the alleged conflict in the reciprocal structure. What if the rate's 30 percent next year? So I think this is a good example. So if they came in and said, you've set it at 30 percent or you've set it at 50 percent, and we challenge that because that's new material conduct that was not present in the other cases, that's not claim precluded. In fact, I think. Well, it's new material conduct because it changes from year to year. Well, it's new conduct because it changes every year. What I'm trying to get at is whether it's material. And the reason I ask the question about 30 percent is it seems to me materially different if it's 30 percent because that appears to be in clear violation of the limit set by the subscriber agreement. Correct, Your Honor. So you concede that if the rate is 26 percent next year, they're in court, they're not precluded. But anything 25 percent or lower, they are precluded. Is that the crux of your argument? That's the essential crux of it. And it's because there's nothing that they've said at any point that speaks to anything unique about the 2019 or 2020 setting. They continue to challenge the same conduct. If it's at 30 percent, then I think it looks like Lucky Brands or Lawler. So you're talking about the same conduct, but I think we're talking about a repeated conduct, right? So, for instance, let's say a defendant punched someone on day one. And that plaintiff wants to sue and say that punch really hurt him, that's one harm. And then a year later, they want to sue and say, well, now I have additional injuries from that punch a year ago, right? That would be the same conduct. But what they're saying is we're getting punched every year. Every year that you set the 25 percent rate anew at this board meeting, that is a new harm. And it only lasts for one year. And then I get harmed again starting January 1st. Isn't there a difference here? This is different conduct. I don't think that's exactly what they're saying. And I don't think the analogy of the punching holds. Because if you actually look at, in a moment of honesty, in their reply brief at page 8, they actually say, quote, the factual circumstances that made indemnities pre-2019 conduct unlawful have remained largely unchanged. And then the only thing they tell you is that, oh, but they've collected fees again in 2020 and 2021. That is like scooper-dooper. If you look at scooper-dooper, it's a situation where there's an agreement with respect to distribution within a certain area. And there's case one decides that that's OK, it's not an antitrust violation. Case two, scooper-dooper comes in and says, oh, we continue to be harmed because they keep distributing in the same place. And now that there's a new harm, we're allowed to bring a new suit. And the court says, you haven't told us anything about that new harm that makes up the core and the guts of your claim. And you haven't even tried to establish it. And I would tell you, Your Honor, I think it really matters here that not only today have they not been able to tell you anything about the 2019 and 2020 that's different and that's unique and that drives their claim, but they were given that opportunity multiple times. Obviously, first of all, when they filed Stevenson 1, they knew that RITs existed. RITs addressed exactly this argument. And it addressed the argument that there were two new years in RITs that didn't exist in belts, but they didn't plead anything different. They pled a copycat complaint. So can I just tease this? I'm thinking about this a little bit differently in this sense. And when I leave this question, you're going to know I'm thinking about it a little bit differently. But Article III standing, in order to have an injury in fact, you have to have an injury that is some of the requirements are actual or imminent. There's other requirements, but actual or imminent. And so if a party comes in 2019 and they say, hi, we want to sue about the rate you're going to set in 2021, I mean, I think everyone would say, get out of here. That's not actual and that's not imminent. And so if you couldn't, if you don't have standing in 2018 to sue for a rate that's being set in 2021, how can that be a claim that could have been brought in 2018? So a couple of things, Your Honor. The first thing I'd say is they're not challenging what is done in 2019 in the sense, they're not saying the unlawful conduct that makes up the core of their claim is any different from 19 to 18, 17, 16, going all the way back to 07. That's what they say in the reply brief. They're saying the unlawful conduct. But do you agree with me that if you show up in 18 and say, I mean, you might have been the counsel in 18 making the standing argument, frankly. If they showed up in 18 and said, you know what, forget everything that's happened to date. We want to make a clean break. Just want to put all this behind us. And we want to sue about what we think you're going to do in 2021. I think you would show up and say, get out. This is speculative. It's not actual. It's not imminent. It's not concrete. And you would say, you can't bring this claim now. And if they can't bring the claim now, then it seems that looking back, I interrupted you. It's OK. I understand the impulse. I think what it really does come down to, and if you look at Huck and Sims, I mean, Sims is a case that's about new seasons and an entirely new show. And the court says, doesn't matter. The argument was made in Sims. How could we have sued on it at the time when the seasons didn't exist? Because the conduct that is challenged is not the mere production of the show. It's not the mere collection of the fee. The conduct challenge is the unchanged facts. And I think if you look at Ritz, this is what the court, same district judge, is saying in Ritz when the plaintiffs in Ritz came in and said, you can't find this claim precluded. We're challenging two new years. She said, it doesn't matter because you're challenging the same controlling facts in the case. So I'm not trying to put words in your mouth here.  But if I hear what your answer says, I think you would say you do have standing in 2018 to sue for what's going to happen in 2021, as long as your theory is that you're going to bring the exact, you think the world's going to be the same in 2021. At least we have standing for that. I think you're right, Your Honor. And think of it this way. If they had brought, say, back in the day when they filed this first suit, they brought a declaratory judgment and a request for an injunction that says you can't take the 25% now and going forward. And that's because we think that there's an inherent conflict in this structure. We think that the Hurt family has a controlling stake in the company, that indemnity is trying to benefit indemnity over the exchange, and we don't think you should be able to take the 25%. I agree with you, Judge Hardiman. The claim itself doesn't make any sense to me that there's a contractual provision saying 25%. But if they said in that first action, they said we want an injunction that stops this from ever happening again, because our core theory would apply no matter what, no matter what year. They would have standing to do that, and they'd have standing to enjoin it. But having not done that and having now challenged exactly the same conduct that they twice lost on before, they can't come in and just keep suing the same company on the same theory over and over. And it's not just suing them on the same theory over and over, but it's having lost in federal court twice, running to state court, getting removed, changing their theory in order to get back to state court. It's a classic case of relitigation exception applying. So even if, let's assume that we agree with you that this is precluded, that does not necessarily mean that an injunction should issue, right? Preclusion is common. Preclusion defenses are raised all the time. That is perfectly fine, but the Anti-Injunction Act and the Supreme Court's interpretation of it has said it is extremely rare that a district court should or a court should prevent the state court from hearing a claim. So why is it appropriate in these circumstances, even given preclusion? Sure. So I'm going to give you the easiest case-specific answer here that honestly does not require you to break any new ground, is that on JA 203, this is in the Joint Findings of Fact, paragraph 41, the plaintiffs stipulate that indemnity would have to, quote, expend material amounts of time, resources, and costs, which are unrecoverable. Time is unrecoverable. Resources are unrecoverable. That sounds like something that's common to any time an issue is precluded. No, and certainly not in the relitigation exception context, because there's another thing that is also somewhat case-specific to this case, but really about Pennsylvania law, is that you can't assert, generally speaking, you can't assert preclusion as what they call a preliminary objection, which is essentially like a 12B motion in Pennsylvania state court. It's an affirmative defense asserted as new matter, as they call it. And so you would have to go and litigate all manner of things before you got to this preclusion defense. And what the relitigation exception does is it's Congress saying, when there is relitigation of a federal judgment, you get to come to federal court and go right to that issue, because otherwise you're threatening the dignity of the federal court. Also what I would say to you, Your Honor, is if you look at the cases, they uniformly, in a setting where there is preclusion and an injunction's been issued, the appellate courts have uniformly upheld there being irreparable harm by virtue of the fact that you're having to relitigate. The opposite view, and I say this with all respect to my friend on the other side, would reinstate the Toosie case that Congress expressly abrogated when it adopted the Anti-Injunction Act's relitigation exception. So it's hard for me to reconcile those other circuits' opinions with the Supreme Court in Chu, where they say, you know, even if an injunction may issue, because there is preclusion, right, then it doesn't mean it must issue. And it's supposed to, again, there's this difference between res judicata, right, which, you know, you have to get past that res judicata bar and then still show that there are equitable reasons why it should issue. So I would say, first thing, Chu was not a case about whether there is irreparable harm. Chu was about whether there was issue preclusion, same as Smith v. Bayer. In both cases, the court said there's just simply not issue preclusion, so the AIA plaintiff lost just on that issue. So I don't think the Supreme Court's actually speaking to anything with respect to irreparable harm when it says that. But it does say that a federal court does not usually get to dictate to other courts the preclusion consequences of its own judgment, right? And so that is a broad principle. Sure, but taken to its logical extreme, that just means the relitigation exception can never be enforced. And that's essentially what the Supreme Court in 1941 said in 2C, was that, oh, it's fine. You can just go to state court. You'll have a preclusion defense. If it's such a great preclusion defense, you'll surely win in state court. Seven years later, Congress abrogated that decision and said, no, we're going to give you the opportunity to get an injunction in federal court. Yes, it's narrow. But here, where it's clear that preclusion applies, I'd say twice over, maybe three times over when you count the cases and the preclusions. But when that's clear, then that is the irreparable harm. If you're forced to go defend a judgment in state court once again that you've already won, and particularly here when we have a concession, that there's time and resources that would be expended, and when you have Pennsylvania state court where you don't even get to litigate it out of the gate and instead you might have to face all sorts of other issues, I think that it's clear that there's irreparable harm here. And I think adopting the opposite view would essentially gut the relitigation exception. So when the district court ruled on irreparable harm, it said that the harm is potentially being denied the benefits of the judgments in its favor, and that a single state court might decline to accord preclusive effect. So with all that speculation, how can we say that there's a finding of irreparable harm? So that's inherent, obviously, in the fact that you bring the relitigation injunction request before preclusion's been decided in state court. And you have to do that because what the Supreme Court said in Parsons Steel is that once the state court decides it, you can no longer attack it. So it becomes moot. So in every setting where you're actually adjudicating relitigation, it's always going to be true that one of the risks of harm, and I'm not saying this is the only harm, but one of them is the risk that the state court will disagree and that it will essentially nullify the federal judgments and not enforce the relitigation exception. Should we say that any time a federal judgment is impugned that that's irreparable harm? Any time. At least from a public interest standpoint. So I think any time that a plaintiff tries to go to state court to essentially nullify or thwart a federal judgment, I do think the design of the AIA relitigation exception is essentially that is an irreparable harm. What if there was fees available for relitigating? If the state said, hey, forget the American rule. We're going old school. We're going English rule. All your time, all your fees fully recouped. Then it seems that the harm is much, much, much less irreparable. Honestly, Your Honor, I disagree, and it may just be I'm living with this case. I'm living with this client. There is a lot of distraction that comes with litigation like this. There's a lot of time and resources that could be devoted to other things that have to be devoted to litigating this case. And so merely getting attorney's fees back does not repair the harm that goes with having to go and relitigate the same cause of action in the state court, particularly, as I said, where you might have to litigate all sorts of other issues before you ever get to preclusion at that point. Where do we take account of the federalism principles underlying the ante-index? It's a good question, Your Honor. Courts have struggled with this. In fact, what they say is that when the relitigation exception is properly applied, it actually empowers federalism in the sense that it prevents friction between state and federal courts. Imagine a world in which state courts could just thwart federal judgments by saying, I don't think this is the same cause of action. Nothing the federal court can do about it. We're going to now relitigate this case for the third time. That is not good for federalism. But, you know, it seems like what you're asking us to say is every time a federal court makes a – every time there's a preclusion, a potential preclusion defense, then a district court can enter an injunction against the state litigation. Not – so a few things, Your Honor. Not any time there's a potential preclusion defense. A viable preclusion defense. An actual preclusion defense. So I do think the case law fairly supports the notion that that alone is enough. What I'm telling you here today, because I understand you may not want to bite off that issue, I'm telling you you don't have to in this case. You can write a very fact-bound, narrow decision that says they stipulated that there would be non-recoverable costs. And in Pennsylvania, you don't get to go right to res judicata and issue preclusion. And so clearly there would be in this situation all sorts of, you know, you have to go in before you ever get to the preclusion issue, which applies. And so I don't – None of those things seem to matter to the district court, though, right? The district court, it was more, you know, this is crazy that we have to keep doing this over and over again. And it seemed to be more a species of the court was frustrated that its judgment was being impugned or potentially impugned. So I do think the court was frustrated, and I would say I do think it's worth noting it was the same district judge from Ritz, right? But I think you read her opinion. And what she relies on are the cases that do say that finding that re-litigation applies means that there's irreparable harm. That's fair for her to do. But I think you obviously can affirm for any basis that's supported in the record. And so if you're uncomfortable with that sort of broad per se rule, then there's facts that you can look at in this case, facts that were stipulated to legal facts about how cases proceed in Pennsylvania State Court that get you there without having to rely on a per se rule. So the non-recoverable expenses and the inability to litigate preclusion at the outset in Pennsylvania seem to apply to any state litigation in Pennsylvania, wouldn't it? Wouldn't they? Well, but I think the question here is would we suffer irreparable harm? What I'm getting at is if we say, well, look, it's irreparable harm because the state litigation was brought in Pennsylvania and these circumstances surrounding Pennsylvania civil procedure mean that you're going to suffer in these certain ways. But that's not unique to this case. That's any civil case that's brought in Pennsylvania. Perhaps. I think you do have a stipulation here that they say that those harms would fall to us. I think once in a while you might see an AIA case where they say preclusion won't resolve the entire case. And therefore, the equation on irreparable harm might be a little bit different because there's a whole set of issues that aren't subject to preclusion. That might be different. But here, I think when you look at the case law, it's quite clear that when you're forced to go and re-litigate an issue, expend all of the irrecoverable time and resources, not even get to do it right away, if any holding otherwise would essentially nullify the re-litigation exception. Because you could always say, well, yeah, you can present your arguments in state court. That's what the Supreme Court said in Toosie, and it's what Congress rejected seven years later. This might be a gloss on Judge Freeman's question, but you could imagine a state where the cost and the expenses would be radically different. If a state said, you know what, we have an expedited motion process that will resolve in the first ten days any claims of race judicata, and we will do a complete and total reimbursement of trouble attorney's fees to cover you for any of your trouble and expense. In such a state there, you might just sit there and say, hey, wait. You know, that's way better than anything the AIA ever gives us. So you might just make an election, an intelligent election to opt for that. But also it begins to take the legs out of the notion of irreparable harm. And maybe that's not a bad thing. Maybe the application of the AIA is, under federalism concerns, kind of varies based on state to state. And a state that takes away in its efforts to accommodate federalism, the AIA may need to do less work. But if a state says, no, we aren't really so concerned about giving effective federal judgments, maybe the AIA needs to do more work there. That very well may be true. And obviously they've never argued that here with respect to Pennsylvania. And I think it's telling that they desperately want to be in Pennsylvania courts rather than to litigate this issue in federal courts, as the plaintiffs did in Belz and Ritz. Thank you, Mr. Kinley. Let's hear the rebuttal from Mr. Sansone. Thank you, Your Honors. I just want to pick up on this discussion of federalism. The Supreme Court has made clear that even if a preclusion question is even close, the answer is easy, that it should be the state court to resolve that question. Here, the complaint in the state court action, despite counsel on the other side's sort of desire to characterize it as going back to the claims that were presented in Belz and Ritz, nothing in the complaint references anything from 2007, 2008, so on and so forth. Nothing about the resolution of the claims in the state court complaint require any determination about the legality of any action that indemnity took from 2007 to 2019. And that distinguishes this case dramatically from the Huck case, the Sims case, the Foster case, the cases that indemnity is relying on. In those cases, you know, for example, in Huck, the plaintiff comes to court and says they're continuing to deny me access to the seaplane ramps. There is nothing illegal at all about that conduct unless the plaintiff actually has some legal right to the seaplane ramps. And so the plaintiff could not state a claim, could not say anything in the complaint putting forward a cause of action, unless the plaintiff adverted to the legality of some earlier action or some earlier claim that had been at issue in a prior case. Here, the state court will not need to make any determination about any event that occurred prior to December 2019. And therefore, the legality of those events clearly could not have been put at issue in two cases that entirely preceded that factual conduct. And, you know, we think that that is sufficient to reject their claim preclusion defense. But even if it isn't enough to get rid of that defense out of hand, if this court has any doubts, Atlantic Coast Rail Line makes clear that the benefit of any doubt in an AIA case should be resolved in favor of denying the injunction and allowing state court processes to play themselves out. My friend on the other side says a lot about supposed distractions and harms that indemnity will experience if the state court proceedings are allowed to go forward. It had the opportunity to present evidence of any sort of case-specific harm. It denied the opportunity to hold, to present evidence at a hearing. It's a per se rule, essentially. Exactly. And we think that the district court's adoption of a per se legal rule, that any time there is what the district court perceives to be a viable claim preclusion defense under Federal law, per se constitutes irreparable harm. The adoption of that per se rule was error. It's inconsistent with Chick Kam Choo's recognition that the fact that an injunction may issue does not mean that it must issue. So at a minimum, that creates a basis for this court to remand for the district court to exercise discretion that it believed it lacked. Thank you, Mr. Sansone. Thank you, Mr. Kenley. The court will take the matter under advisement.